**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **FREDERICK KERN,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | Civil Action No.  3:14-CV-0437-BH |
| | § | |
| **CAROLYN W. COLVIN, ACTING** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | |

**MEMORANDUM OPINION AND ORDER**

Pursuant to the consent of the parties and the order of reassignment dated May 15, 2014, this case has been transferred for the conduct of all further proceedings and the entry of judgment. Before the Court are *Plaintiff's Brief on Review of the Social Security Administration's Denial of Benefits*, filed May 27, 2014 (doc. 16), and *Commissioner's Brief*, filed June 26, 2014 (doc. 17). Based on the relevant filings, evidence, and applicable law, the Commissioner's decision is **REVERSED**, and the case is **REMANDED** for reconsideration.

## I.  BACKGROUND[1]

### A.     Procedural History

Frederick Kern (Plaintiff) seeks judicial review of a final decision by the Acting Commissioner of Social Security (Commissioner) denying his claim for disability insurance benefits (DIB) under Title II of the Social Security Act. (R. at 1, 91.)  Plaintiff applied for DBI on May 13, 2011, alleging disability beginning December 1, 2009.  (R. at 131, 184.)  His claim was denied

---

[1] The background comes from the transcript of the administrative proceedings, which is designated as "R."

initially and upon reconsideration.  (R. at 134, 142.)  Plaintiff requested a hearing before an

Administrative Law Judge (ALJ), and personally appeared and testified at a hearing held on July 16,

2012.  (R. at 118, 146)  On October 10, 2012, the ALJ issued a decision finding Plaintiff not

disabled.  (R. at 91-104.)  Plaintiff appealed, and the Appeals Council denied his request for review

on December 16, 2013, making the ALJ's decision the final decision of the Commissioner.  (R. at

1.)  Plaintiff timely appealed the Commissioner's decision under 42 U.S.C. § 405(g).  (*See* doc. 1.)

## B.      Factual History

### 1.      Age, Education, and Work Experience

Plaintiff was born on February 19, 1958, and was 54 years old at the time of the hearing

before the ALJ.  (R. at 121.)  He completed high school and had past relevant work as a house

painter.  (R. at 121-23.)

### 2.      Medical, Psychological, and Psychiatric Evidence

Plaintiff visited Neurological Clinic of Texas on February 17, 2010, for a routine epilepsy

follow-up examination with Jay Harvey, D.O.  (R. at 371.)  He reported that he suffered simple

partial seizures one to two times per week "almost all with daytime nap." (*Id.*)  Plaintiff stated that

he experienced "auras[2] that are brief and without any postictal problems." (*Id.*)  Dr. Harvey

observed that Plaintiff had focal seizures,[3] but he was neurologically stable.  (R. at 372.)  He ordered

a magnetic resonance imaging (MRI) scan of the brain.  (*Id.*)

---

[2]  An aura is "a subjective sensation (as of voices or colored lights or crawling and numbness) experienced before an attack of some nervous disorders (as epilepsy or migraine)."  AURA, Merriam-Webster Medical Dictionary (March 10, 2015, 3:01 PM), http://www.merriam-webster.com/medical/aura.

[3]  "When seizures appear to result from abnormal activity in just one area of your brain, they are called focal (partial) seizures."  FOCAL SEIZURES, Mayo Clinic (March 10, 2015, 3:03 PM), http://www.mayoclinic.org/disease-conditions/epilepsy/symptoms-causes/dxc-20117207.

On March 3, 2010, Warren Whitlow, M.D., at Southwest Diagnostic Imaging Center, read MRI scans of Plaintiff's head with and without contrast.  (R. at 284.)  Dr. Whitlow noted "[p]ostoperative changes partial right temporal lobectomy[]" and "[a]ssociated enlargement of the temporal horn right lateral ventricle and some surrounding gliosis within the remaining right temporal lobe."  (*Id.*)  He also observed "[s]cattered nonspecific foci of increased [flair] and T2 signal intensity within the cerebral white matter."  (R. at 284-85.)  Dr. Whitlow noted "[n]o significant change since most recent comparison on 06/15/2007."  (R. at 285.)

On May 12, 2010, Plaintiff saw Dr. Harvey at Neurological Clinic of Texas for another epilepsy follow-up visit.  (R. at 369.)  Plaintiff again reported that he had been experiencing simple partial seizures one to two times per week while napping.  (*Id.*)  He reported that his condition was stable, he was sleeping well, and he had "auras that are brief and without any postictal problems[.]"  (*Id.*)  Dr. Harvey observed that Plaintiff was neurologically stable.  (R. at 370.)

On May 17, 2010, Plaintiff saw Neal Sklaver, M.D., at Medical Specialists Associated, for a medical examination.  (R. at 294, 300, 633-35.)  He complained of seizure disorder, GERD,[4] and nausea.  (R. at 300.)  A review of Plaintiff's systems showed that everything was normal.  (R. at 300, 633-34.)  A physical examination also showed normal conditions.  (R. at 301, 634.)  The final assessment was seizure disorder, hyperlipidemia,[5] and vertigo.  (*Id.*)

On April 11, 2011, Plaintiff saw Dr. Harvey for a follow-up visit.  (R. at 366.)  Plaintiff

---

[4]  "Gastroesophageal reflux disease (GERD) is a chronic digestive disease.  GERD occurs when stomach acid or, occasionally, stomach content, flows back into [a person's] food pipe (esophagus).  The backwash (reflux) irritates the lining of [the person's] esophagus and causes GERD."  GERD, Mayo Clinic (March 10, 2015, 3:05 PM), http://www.mayoclinic.org/disease-conditions/gerd/basics/definition/con-20025201.

[5]  "Hyperlipidemia is the medical term for high levels of fat in the blood."  HIPERLIPIDEMIA, National Institute of Health (March 10, 2015, 3:07 PM), http://aidsinfo.nih.gov/education-materials/fact-sheets/22/66/hiv-and-hyperlipidemia

complained of simple partial seizures, but "only during the day and only with naps but not every time." (*Id.*) Dr. Harvey found no change in Plaintiff's condition. (R. at 367.) He noted that Plaintiff had intractable, pharmacoresistant epilepsy[6] and the condition was related to the 2004 lobectomy. (*Id.*)

On the same day, Plaintiff saw Dr. Sklaver at Medical Specialists Associated. (R. at 294.) Plaintiff complained of seizure disorder, GERD, and nausea. (R. at 294, 650.) A review of Plaintiff's systems was normal. (R. at 295, 651.) A physical examination also showed that everything was normal. (R. at 296, 652.) A chest X-ray and EKG showed normal conditions. (R. at 297, 653.) Dr. Sklaver's opined that Plaintiff had hyperlipidemia and seizure disorder. (R. at 297.) He noted that Plaintiff's conditions were "considered to be stable." (*Id.*)

On June 2, 2011 Dr. Harvey completed a questionnaire from the Department of Assistive and Rehabilitative Services for determination of disability. (R. at 324-25.) He noted Plaintiff's simple partial seizure at the frequency of six times per month, and that 100% of the seizures were nocturnal. (R. at 324.) He also stated that there was no postictal behavior related to the seizures, and that no residual effects were noted the day after a night-time seizure. (R. at 324-25.) He believed that Plaintiff was compliant with his medication. (R. at 325.)

On July 7, 2011, Frederick Cremona, M.D., a state agency medical consultant (SAMC), completed a Physical Residual Functional Capacity Assessment (RFC) form. (R. at 326-33.) Dr. Cremona found that due to Plaintiff's seizure disorder, he could climb ramps and stairs, balance, stoop, kneel, crouch, and crawl frequently, but he could never climb a ladder, rope, or scaffolds. (R.

---

[6] "The International League Against Epilepsy (ILAE) defines pharmacoresistant epilepsy as the failure of a patient's seizures to respond to at least two antiepileptic medications that are appropriately chosen and used for an adequate period." ILAE, Cleveland Clinic (March 10, 2015, 3:08 PM), http://my.clevelandclinic.org/ccf/media/files/Neurological-Institute/epilepsy-center/pharmacoresistant-epilep.pdf.

at 328.)  He found no exertional, manipulative, visual, and communicative limitations, however. (R. at 327, 329-30.)  As for environmental limitations, he noted that Plaintiff should avoid even moderate exposure to hazards, and stated that "[d]ue to seizures, [Plaintiff] should avoid unprotected heights, open flames, moving and open machinery." (R. at 330.) Dr. Cremona noted that Plaintiff's "alleged limitations caused by [his symptoms] are partially supported by the medical and other evidence in file." (R. at 331.)  He also noted Plaintiff's history of "simple partial focal nocturnal seizures. . . . [and] that [Plaintiff had] no residual effects noted the day after night time seizure." (R. at 333.)  Dr. Cremona also observed that the April 11, 2011 examination showed that Plaintiff was in normal physical condition, with a normal EKG reading and chest X-ray.  (*Id.*)

On July 8, 2011, Sanaa Farah-Fagan, a state agency vocational consultant, completed a Sequential Vocational Guide.  (R. at 103, 229.)  She noted that Plaintiff's RFC was nonexertional. (R. at 229.)  Farah-Fagan concluded that the jobs that are available in significant numbers within the state of Texas and the national job markets that Plaintiff can perform were dowel inspector, DOT 669-687-014, button reclaimer, DOT 734-687-042, and table worker, DOT 739-687-182.  (*Id.*)

On September 7, 2011, Plaintiff saw Dr. Harvey for an epilepsy follow-up appointment.  (R. at 338.)  He complained that his memory had been deteriorating since 2007, and he had some anger outbursts over trivial issues in the past two years.  (*Id.*)  Plaintiff also reported that he suffered from dizziness and irritable bowel syndrome.  (*Id.*)  He had severe dizziness and had fallen in the past month.  (*Id.*)  Plaintiff's wife felt that he had trouble concentrating for long periods of time.  (*Id.*) Dr. Harvey assessed Plaintiff's epilepsy as partial without loss of consciousness and intractable, and noted that his condition was unchanged.  (R. at 339.)  He ordered neuro-psych testing.  (*Id.*)

On October 11, 2011, Teresa Fox, M.D., an SAMC, completed a Case Assessment Form.

(R. at 340.)  After reviewing all of the evidence on file, Dr. Fox affirmed the July 7, 2011 assessment by Dr. Cremona.  (*Id.*)

On November 9, 2011, Jeanne C. Selby, Ph.D., conducted a clinical interview and mental status exam of Plaintiff.  (R. at 342-46.)  Dr. Selby diagnosed Plaintiff with cognitive disorder and major depressive disorder, recurrent, mild.  (R. at 345.)  She gave Plaintiff a GAF score of 51.[7]  (*Id.*) She noted that Plaintiff's "occupational and emotional functioning appear to be impaired by symptoms of Cognitive Disorder NOS resulting from Epilepsy and ongoing simple partial seizure activity."  (*Id.*)  She concluded that "[h]is prognosis for improved occupational and emotional functioning at the present time is guarded", and that Plaintiff required assistance managing money. (*Id.*)

On December 2, 2011, LaAndrea Thigpen, a state agency vocational consultant, completed a Sequential Vocational Guide.  (R. at 247.)  She noted that Plaintiff had a nonexertional RFC and his mental RFC qualified him for unskilled work.  (*Id.*)  She listed jobs available in significant numbers within the state of Texas and the national job markets as clocker, DOT 153-367-010, marker, DOT 209-587-034, and caller, DOT 215-563-010.  (*Id.*)

On December 6, 2011, Lee Wallace, Ph.D., an SAMC, completed a Psychiatric Review Technique form (PRTF).  (R. at 347-60.)  Dr. Wallace diagnosed Plaintiff with cognitive disorder and major depressive disorder, mild.  (R. at 348, 350.)  He opined that Plaintiff had mild restriction on daily living activities, moderate difficulties in maintaining social function, and moderate limitations on maintaining concentration, persistence, or pace, and no episode of decompensation

---

[7]  GAF is a standardized measure of psychological, social, and occupational functioning used in assessing a patient's mental health.  *See Boyd v. Apfel*, 239 F.3d 698, 700 n. 2 (5th Cir. 2001).  A GAF score of 51 to 60 indicates a "moderate" impairment in social, occupational, or school functioning.  *American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders* (DSM–IV-TR) p. 34 (4th ed., rev.2000).

of extended duration.  (R. at 357.)  Upon review of Plaintiff's medical records, Dr. Wallace

concluded that the "alleged limitations are only partially supported" by the record.  (R. at 359.)

Dr. Wallace also completed a mental RFC assessment (MRFC).  (R. at 361-64.)  He

determined that Plaintiff was markedly limited in two work-related abilities: the ability to

understand and remember detailed instructions, and the ability to carry out detailed instructions.  (R.

at 361.)  Dr. Wallace found that Plaintiff was moderately limited in nine work-related abilities: the

ability to remember locations and work-like procedures; the ability to maintain attention and

concentration for extended periods; the ability to perform activities within a schedule, maintain

regular attendance, and be punctual within customary tolerances; the ability to sustain an ordinary

routine without special supervision; the ability to complete a normal workday and workweek without

interruptions from psychologically based symptoms and to perform at a consistent pace without an

unreasonable number and length of rest periods; the ability to accept instructions and respond

appropriately to criticism from supervisors; the ability to get along with coworkers or peers without

distracting them or exhibiting behavioral extremes; the ability to respond appropriately to changes

in the work setting; and the ability to set realistic goals or make plans independently of others.  (R.

at 361-62.)  He also determined that Plaintiff was not significantly limited in nine abilities, including

the ability to understand and remember very short and simple instructions, and carry out very short

and simple instructions.  (*Id.*)  He opined that Plaintiff can do unskilled work and that he "can

understand, remember and carry out simple instructions, make simple decisions, attend and

concentrate extended periods."  (R. at 363.)  He also concluded that Plaintiff "can interact

adequately [with] co-workers and supervisors and respond to changes in routine work settings."

(*Id.*)

-7-

On March 26, 2012, Plaintiff saw Dr. Sklaver for a follow-up examination. (R. at 720.) Plaintiff complained of a mild seizure disorder occurring once or twice a week, GERD with frequent symptoms, and nausea. (*Id.*) A review of his systems showed no abnormal conditions. (R. at 721.) A physical examination also showed normal conditions. (R. at 722.) His chest x-ray and EKG were normal. (R. at 723.) Dr. Sklaver's assessment was seizure disorder and hyperlipidemia. (*Id.*)

On April 4, 2012, Dr. Harvey saw Plaintiff at Texas Epilepsy Group for a follow-up visit. (R. at 730.) Plaintiff complained that he felt "like he [was] having an aura" when he fell asleep in the afternoon, and that three weeks earlier he "had a seizure with lip smacking but no [alteration of consciousness] or [loss of consciousness]." (*Id.*) He reported that he had a seizure "[a]lmost any time he [fell] asleep in the [afternoon] hours." (*Id.*) Plaintiff had no complaints about his medication. (*Id.*) Dr. Harvey's diagnosis was epilepsy, partial without loss of consciousness, and intractable as deteriorated. (R. at 731.)

### 3.    Hearing Testimony

On July 16, 2012, Plaintiff testified at a hearing before the ALJ. (R. at 118-30.) He was represented by an attorney. (R. at 118, 120.)

#### a.    *Plaintiff's Testimony*

Plaintiff testified that he was born on February 19, 1958, and had a high school education. (R. at 121.) He was married and had no children under the age of 18. (R. at 121.)

Plaintiff had worked as a house painter in the past 15 years. (R. at 122-23.) After he had surgery in 2004, he continued to work as a house painter but earned significantly less because he could not do the jobs. (R. at 128.) Plaintiff no longer worked due to simple partial seizures and occasional breakthrough seizures, "like a staring spell." (R. at 123.) He had seizures about twice

a day.  (R. at 126-27.)  Plaintiff normally experienced an "aura" before a seizure, but sometimes he experienced an aura without a seizure.  (R. at 127.)  When Plaintiff had seizures, he became unaware of his surroundings.  (R. at 123, 127.)  He had painted the wrong room or used the wrong color once in a while.  (R. at 123-24.)  Although working as a house painter required Plaintiff to use maps, he could no longer use maps because he became unsure of where he was, got confused, got lost while driving, and had concentration problems.  (R. at 123-24.)  He also got lost when going to a place he had been to many times.  (R. at 125.)  He got irritable, had anger bursts, and occasionally suffered dizziness.  (R. at 124.)  Plaintiff testified that due to the seizures, he would not be able to sustain a job requiring him to work eight hours a day, five days a week.  (R. at 126.)

At home, Plaintiff did house chores like washing, drying, cooking, and getting mail.  (R. at 126.)  He used to be able to go to a store to pick up items for his wife without a written list, but he now needed a written list to get the correct items.  (R. at 124-25.)  There were times that he got confused while watching a television program.  (R. at 125.)  He testified that he would not be able to do everything to run a house, like manage money and pay bills, without his wife.  (R. at 127-28.)

**C.    ALJ's Findings**

The ALJ issued his decision denying benefits on October 10, 2012.  (R. at 91-104.)  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since December 1, 2009 "through his date last insured of September 30, 2011[.]"  (R. at 96.)  At step two, the ALJ found that Plaintiff had four severe impairments: "seizure disorder, hyperlipidemia, cognitive and depression disorder[, and] GERD[.]"  (*Id.*)  At step three, the ALJ found that Plaintiff's impairments did not meet or medically equal the severity of an impairment listed in the regulations.  (*Id.*)

Before proceeding to step four, the ALJ determined that Plaintiff had the RFC to perform

a wide range of light work: lift and carry 20 pounds occasionally and 10 pounds frequently; sit, stand and/or walk six hours out of an eight-hour day; no limit in pushing and/or pulling with his upper or lower extremities; avoid hazards like dangerous moving machinery and unprotected heights; and no postural, manipulative, visual or communicative limitations.  (R. at 98.)  The ALJ concluded that Plaintiff could understand, remember, and carry out simple instructions and make simple decisions. (*Id.*)  He was limited to semiskilled and unskilled work.  (*Id.*)  At step four, the ALJ determined that Plaintiff was unable to perform any of his past relevant work.  (R. at 102.)  At step five, the ALJ consulted the medical-vocational guidelines and found that considering Plaintiff's age, education, and work experience, he could perform the jobs of a dowel inspector, a button reclaimer, and a table worker, jobs that "are available in significant numbers in the state of Texas and the national job markets."  (R. at 103.)  Accordingly, the ALJ concluded that Plaintiff was not disabled, as the term is defined under the Social Security Act, at any time between his alleged onset date and the date last insured.  (*Id.*)

## II.  ANALYSIS

### A.  Legal Standards

#### 1.    Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g).  "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance."  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting

*Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)).   In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.   A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision.   *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program.   *Davis v. Heckler*, 759 F.2d 432, 435 n. 1 (5th Cir. 1985).   Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income.   *See id.*   Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision.   *See id.* at 436 and n.1.

### 2.        Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act.   *Leggett*, 67 F.3d at 563-64.   The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. § 423(d)(1)(A).   When a claimant's insured status has expired, the claimant "must not only prove" disability, but that the disability existed "prior to the expiration of [his or] her insured status." *Anthony*, 954 F.2d at 295.   An "impairment which had its onset or became disabling after the special

earnings test was last met cannot serve as the basis for a finding of disability." *Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir. 1985).

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant is disabled:

1.    An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.    An individual who does not have a "severe impairment" will not be found to be disabled.

3.    An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.    If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.    If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v) (2012)).  Under the first four steps of the analysis, the burden lies with the claimant to prove disability.  *Leggett*, 67 F.3d at 564.  The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled.  *Id.*  Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing.  *Greenspan*, 38 F.3d at 236.  This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence.  *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).  After the Commissioner fulfills this burden, the burden shifts back

to the claimant to show that he cannot perform the alternate work.  *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005).  "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis."  *Loveland v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.**    **Issues for Review**

Plaintiff presents two issues for review:

1.      Is the ALJ's finding that [Plaintiff] could perform other work supported by substantial evidence where 1) no vocational expert testified; 2) [Plaintiff] has exertional and non-exertional limitations; and 3) the only supportive evidence is a State agency vocational report that applied a different RFC than the one the ALJ found in his decision?; [and]

2.      Did the ALJ reversibly err where he found that [Plaintiff] could perform work that exists in significant numbers yet did not provide specific numbers or elicit vocational expert testimony to demonstrate the incidence of such work?

**C.**    **Other Work**

Plaintiff contends that the ALJ erred in finding at step five that he could perform other work. (Doc. 16 at 10-14.)

To be considered disabled, a claimant must have a severe impairment that makes him unable to perform his previous work or any other substantial gainful activity existing in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1505(a).  According to the Code of Federal Regulations, "[w]ork exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements [that a claimant is] able to meet with [his] physical or mental abilities and vocational qualifications."  20 C.F.R. § 404.1566(b).  It is the Commissioner's burden at step five to show that a claimant is capable of performing other gainful employment in the national economy.  20 C.F.R. § 404.1520(a)(4)(i); *Greenspan*, 38 F.3d at 236.

-13-

Once the Commissioner finds that jobs in the national economy are available to a claimant, the burden of proof shifts back to the claimant to rebut this finding. *See Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (citing *Fraga*, 810 F.2d at 1302).

To establish that work exists for a claimant at step five of the sequential disability determination process, the ALJ relies on the testimony of a VE in response to a hypothetical question[8] or other similar evidence, or on the Medical-Vocational Guidelines promulgated to guide this determination, often referred to as "the Grids."[9] *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994); 20 C.F.R. Pt. 404, Subpt. P, App. 2 (2008). An ALJ may rely exclusively on the Grids if the impairments are solely exertional,[10] or if the nonexertional impairments do not sufficiently or significantly[11] affect the RFC. *Newton*, 209

---

[8] "The ALJ relies on VE testimony in response to a hypothetical question because the VE 'is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *Benton ex rel. Benton v. Astrue*, 3:12-CV-874-D, 2012 WL 5451819, at *7 (N.D. Tex. Nov. 8, 2012) (quoting *Carey v. Apfel*, 230 F.3d 131, 145 (5th Cir.2000)). A hypothetical question posed by an ALJ to a VE must reasonably incorporate all the claimant's disabilities recognized by the ALJ and the claimant must be afforded a fair opportunity to correct any deficiencies in the hypothetical question. *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994). If, in making a disability determination, the ALJ relied on testimony elicited by a defective hypothetical question, the ALJ did not carry his burden of proof to show that despite an impairment, a claimant could perform available work. *Boyd v. Apfel*, 239 F.3d 698, 708 (5th Cir. 2001).

[9] The Grids are divided into age categories, and the determination of whether an individual is presumptively disabled differs depending upon the age category and other factors. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2.

[10] Under the Social Security regulations, impairments are either exertional or nonexertional. Impairments are classified as exertional if they affect the claimant's ability to meet the strength demands of jobs. The classification of a limitation as exertional is related to the United States Department of Labor's classification of jobs by various exertion levels (sedentary, light, medium, heavy, very heavy) in terms of the strength demands for sitting, standing, walking, lifting, carrying, pushing, and pulling. All other impairments are classified as nonexertional. *See Holiday v. Barnhart*, 460 F.Supp.2d 790, 806 (S.D. Tex. 2006) (citing *Sykes v. Apfel*, 228 F.3d 259, 263 (3d Cir. 2000) and 20 C.F.R. § 404.1569(a)); *see also* Social Security Ruling (SSR) 96-9P (1996), 1996 WL 374185, at *5 ("[A] nonexertional limitation is an *impairment-caused* limitation affecting such capacities as mental abilities, vision, hearing, speech, climbing, balancing, stooping, kneeling, crouching, crawling, reaching, handling, fingering, and feeling. Environmental restrictions are also considered to be nonexertional." (emphasis original)).

[11] *Compare Newton*, 209 F.3d at 458 (the nonexertional impairments "do not *sufficiently*" affect the RFC) (emphasis added), *with Selders*, 914 F.2d at 619 (the nonexertional impairments "do not *significantly*" affect the RFC) (emphasis added); *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987)(same).

F.3d at 458 (citing *Fraga*, 810 F.2d at 1304 (stating that when "the claimant either suffers only from exertional impairments or his non-exertional impairments do not significantly affect his residual functional capacity, the ALJ may rely exclusively on the Guidelines in determine whether there is other work available that the claimant can perform.")).   If the claimant suffers from nonexertional impairments, or a combination of exertional and nonexertional impairments, then the ALJ must rely on the testimony of a VE or other similar evidence to establish that such jobs exist in the economy. *Id.*   The Grids explicitly state that they "do not direct factual conclusions of disabled or not disabled for individuals with solely nonexertional impairments."   20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e)(1).

Even when the claimant is so affected by a nonexertional impairment as to preclude resort to the Grids, they "may nevertheless be consulted as a 'framework' for consideration of how much the individual's work capability is further diminished in terms of any types of jobs that would be contraindicated by the nonexertional limitations." *Moore v. Social Sec. Admin.*, 153 F. App'x 945, 947 (5th Cir. 2005) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e)(2) (2005)).   When using the Grids as a framework, the agency's regulation and rulings state that when a claimant has a combination of exertional and nonexertional limitations and the exertional limitation directs a finding of "disabled," then "there is no need to consider the additional effects of a nonexertional impairment".   SSR 83-14, 1983 WL 31254 at *3; 20 C.F.R. Pt. 404, Subpt. P., App. 2, § 200.00(e)(2); *see also Rodriguez v. Barnhart*, No. CIV. SA05CA1203-FB, 2006 WL 3779777, at *2 (W.D. Tex. Nov. 6, 2006).   "If the applicable rule directs a finding that plaintiff is not disabled, [however,] the Commissioner [must] consider nonexertional limitations and utilize the testimony of a vocational expert." *Rodriguez*, 2006 WL 3779777, at *2; *see also Gonzalez v. Astrue*, No. M-

09-210, 2013 WL 1345298 at *9 n.14 (S.D. Tex. Mar. 29, 2013) (observing that courts and legal scholars have noted that "how exactly the grids provide . . . a framework is unclear . . [but] one thing is clear: Where the claimant's characteristics do not 'coincide exactly' with a Grid rule, the ALJ should introduce expert vocational testimony to further assist him in his 'Grids framework' guided analysis.") (citing *Lawler v. Heckler*, 761 F.2d 195, 197-98 (5th Cir. 1985)).

In this case, the ALJ found at step two that Plaintiff had severe "cognitive and depression disorder". (R. at 96)*.* Although he found that this severe disorder did not meet or equal a listed impairment, the ALJ found that it affected Plaintiff's RFC because it limited him to the ability to understand, remember and carry out simple instructions, and to make simple decisions. (R. at 98.) He did not expressly find that Plaintiff's nonexertional impairments did not significantly affect his RFC. (R. at 103.) He also found that Plaintiff had exertional limitations, disagreeing with the state agency physician's conclusion that Plaintiff had no exertional limitations, and concluded that Plaintiff was limited to a light RFC with seizure precautions. (R. at 102.)

At step five, the ALJ noted that "[w]hen the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical-vocational rules are used as a framework for decisionmaking unless there is a rule that directs a conclusion of 'disabled' without considering the additional exertional and/or nonexertional limitations[.]" (R. at 103.) He specifically discussed a Sequential Vocational Guide dated July 8, 2011, in which a state vocational consultant used Medical-Vocational Rule 204.00 as a framework and concluded that there were jobs available in significant numbers within the state of Texas and the national job markets that Plaintiff could perform, and they were dowel inspector, DOT 669-687-

014, button reclaimer, DOT 734-687-042, and table worker, DOT 739-687-182.[12]  (R. at 229.)  The

ALJ noted that the state vocational consultant relied on Rule 204.00[13] as a guide, but because the

DOT positions incorporated in the Sequential Vocational Guide involved "light work," he concluded

that Plaintiff could perform them.  (R. at 103.)  Ultimately, the ALJ concluded that "a finding of 'not

disabled' is directed by Medical-Vocational Rule 202.14."[14]  (*Id.*)  The ALJ did not rely on a VE

testimony.

### 1. Other Similar Evidence

#### a.     DOT

Plaintiff first argues that the ALJ erroneously relied on the DOT to conclude that Plaintiff

could perform other work at step five, citing *Fields v. Bowen*, 805 F.2d 1168 (5th Cir. 1986).  (*See*

doc. 16 at 11.)  In *Fields*, the ALJ found that the claimant suffered from a mental disability, but

relied on the Grids exclusively to determine that she could perform repetitive, low-stress work in

positions such as hand-lacer and pencil inspector.  *Fields*, 805 F.2d at 1170.  The Commissioner

argued that the ALJ properly used the DOT to identify specific positions that she was able to

perform.  *Id.*  Noting that it had never defined the term "other similar evidence," the Fifth Circuit

concluded that the DOT was not "other similar evidence" upon which the Commissioner could rely

---

[12]   A dowel inspector "[i]nspects dowel pins for flaws, such as square ends, knots, or splits, and discards defective dowels[]" and it is a sedentary work.  DOT § 669.687-014.  A button reclaimer "[e]xamines buttons for defects, such as chips and cracks, and separates defective buttons from acceptable ones[]" and is a sedentary work.  DOT § 734.687-042.  A table worker "[e]xamines squares (tiles) of felt-based linoleum material passing along on conveyor and replaces missing and substandard tiles[]" and is a sedentary work.  DOT § 739.687-182.

[13]   Rule 204.00 states: "Maximum sustained work capability limited to heavy work (or very heavy work) a sa result of severe medically determinable impairments."  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 204.00

[14]   Rule 202.14 specifically fits Plaintiff's age category, education, and past work experience.  20 F.C.R. Pt. 404 Subpt. P, App. 2, Rule 202.14 (showing that the rule applied to a claimant who was closely approaching advanced age, high school graduate, and had skilled past work not transferable).

in order to show that other work existed that the claimant could perform  because it "differ[ed] from expert vocational testimony in many ways." *Id.* at 1170-71.  The DOT "simply [gave] a general description of the [job] duties involved".  *Id.* at 1171.  It did not define the hand-lacer and pencil inspector as repetitive, low-stress jobs, "describe the skills or qualifications needed for those positions", or "identify the unique requirements of the positions, such as the pace at which one must work or the environment in which the work is performed." *Id.*  On the other hand, a VE was "familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed" and was "able to compare all the unique requirements of a specified job with the particular ailments a claimant suffer[ed] in order to reach a reasoned conclusion whether the claimant [could] perform the specific job." *Id.* at 1170.  Because the claimant had a nonexertional impairment, making the Grids inapplicable, and the Commissioner had not used the services of a VE or presented other similar evidence, the Fifth Circuit found that his decision was not based on substantial evidence.  *Id.* at 1171.

Here, the ALJ found that Plaintiff suffered from both exertional and nonexertional limitations, and that his nonexertional limitations affected his RFC.  (R. at 98, 102-03.)  He concluded that "a finding of 'not disabled' is directed by Medical-Vocational Rule 202.14", and he also found that there were three DOT positions that Plaintiff could perform because they were "light jobs." (R. at 102-03.)

As noted in *Fields*, the DOT does not define dowel inspector, button reclaimer, or table worker as light jobs.  Nor does it "describe the skills or qualifications needed for those positions", or "identify the unique requirements of the positions, such as the pace at which one must work or the environment in which the work is performed."  805 F.3d at 1171.  To the extent that the ALJ

relied solely on the Grids or DOT in finding that other work existed in the national economy that Plaintiff could perform, this was error.

### b.      Sequential Vocational Guide

Plaintiff also argues that even if the ALJ relied on the state vocational consultant's Sequential Vocational Guide, it does not constitute "other similar evidence" because it was based on a different RFC.  (Doc. 16 at 13.)  The Fifth Circuit has not specifically considered whether a Sequential Vocational Guide completed by a state vocational consultant constitutes "other similar evidence."  As noted above, when determining whether the DOT was "other similar evidence," the Fifth Circuit compared the information it provided to the information provided by a VE.  *See Fields,* 805 at 1170-71; *see also Carey v. Apfel*, 230 F.3d 131, 141 (5th Cir. 2000) (stating that "the DOT is not comprehensive . . . [and] '[t]he value of a vocational expert is that he [or she] is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'").

As noted in *Fields* with regard to the DOT, the Sequential Vocational Guide does not define dowel inspector, button reclaimer, or table worker as light jobs.  Nor does it "describe the skills or qualifications needed for those positions," or "identify the unique requirements of the positions, such as the pace at which one must work or the environment in which the work is performed."  805 F.3d at 1171.  Like the DOT, the Sequential Vocational Guide is therefore not "other similar evidence" that may be used in place of VE testimony to establish the existence of other work in the national economy that Plaintiff could perform.

Even if it is "other similar evidence," however, the Sequential Vocational Guide noted that Plaintiff's RFC limitation was nonexertional only, but did not specifying what limitations the state

vocational consultant considered in reaching her conclusion.  (R. at 103, 229.)  It did not fully incorporate Plaintiff's RFC and impairments before concluding that Plaintiff could perform the jobs of dowel inspector, button reclaimer, and table worker.  Significantly, the ALJ disagreed with the RFC finding that it had incorporated.  (*See* R. at 103.)  As noted, even a hypothetical question posed by an ALJ to a VE must reasonably incorporate all the claimant's disabilities recognized by the ALJ. *See Bowling*, 36 F.3d at 436.  To the extent that the ALJ relied on the Sequential Vocational Guide in finding that other work existed in the national economy that Plaintiff could perform, this was error.

### 2. Grids

#### a.    Effect on RFC

The Commissioner argues that the ALJ's reliance on the Grids was proper because Plaintiff's nonexertional limitations did not significantly affect his RFC.  (Doc. 17 at 5-6.)  She contends that the Grids "take administrative notice of unskilled work, which is work that involves simple instructions and decisions".  (Doc. 17 at 5.)

As noted, the ALJ did not make a finding that Plaintiff's nonexertional limitations did not significantly affect his RFC.  (*See* R. at 96-104.)  "The ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council."  *Newton*, 209 F.3d at 455.  In *Allsbury v. Barnhart*, 460 F. Supp. 2d 717, 726 (E.D. Tex. 2006), the court found that a claimant's nonexertional limitations on his RFC were not "insignificant" in part because the ALJ made no such finding.  That court also noted that "it would have been internally inconsistent for him to have made such a finding" because he found the "nonexertional impairments, in combination, to be 'severe' which, by definition, means that they significantly limit plaintiff's ability to do basic

work activities." *Id.; see also Milligan v. Colvin,* No. 2:12-CV-101, 2013 WL 5345842, at *4-6 (N.D. Tex. Sep. 24, 2013) (same).  In *Milligan*, the court expressly rejected the Commissioner's argument that characterization of a claimant's nonexertional limitations as limiting him "to an 'unskilled' occupational base is adequate", and "the Grids establish that there are sufficient numbers of unskilled jobs available" because they take into account "an occupational based limited to unskilled jobs."  2013 WL 5345842, at *6.

In addition, the ALJ did not limit Plaintiff to unskilled work in his RFC determination; he specifically found that Plaintiff "is limited to *semiskilled* and unskilled work."  (R. at 98 (emphasis added).)  SSR 82-41 defines semiskilled work as "more complex than unskilled work . . . [and] contain[s] more variables and require[s] more judgment than do[es] unskilled occupations."  SSR 82-41, 1982 WL 31389, at *2.  Regulations 416.968(b) and 404.1568(b) state that semiskilled jobs "may require alertness and close attention . . . coordination and dexterity[.]"  20 C.F.R. §§ 404.968(b), 404.1568(b).  Some semiskilled work involves spending "considerable time doing, typing, filing, tabulating and posting data in record books, preparing invoices and statements, operating adding and calculating machines[.]"  SSR 82-41, 1982 WL 31389, at *3.  Any administrative notice of unskilled work is not sufficient to support a finding that Plaintiff's nonexertional limitations did not significantly affect his RFC for semiskilled work.

**b.    Environmental Restriction**

The Commissioner also argues that "both Fifth Circuit precedent and Agency policy state that a prohibition from dangerous heights or machinery does not preclude use of the [G]rids." (Doc. 17 at 5-6 (citing *January v. Astrue*, 400 F. App'x 929, 932 (5th Cir. 2010) ("A person with a seizure disorder who is restricted only from being on unprotected elevations and near dangerous moving

machinery is an example of someone whose environmental restriction does not have a significant effect on work that exist[s] at all exertional levels."), and *Arce v. Barnhart*, 185 F.App'x 437, 439 (5th Cir. 2006)).

In *January,* the claimant had only one nonexertional limitation, i.e., an environmental restriction prohibiting her from working around machinery or heights. *See January*, 400 F. App'x at 931-32. Citing to Social Security Ruling 85-15, the *January* court concluded that the ALJ's reliance on the Grids was harmless because SSR 85-15 specifically stated that "a person with a seizure disorder who is restricted *only* from being on unprotected elevations and near dangerous moving machinery is an example of someone whose environmental restriction does not have a significant effect on work that exists at all exertional levels." *Id.* (emphasis added). In *Arce*, the claimant suffered from seizure disorder and borderline intelligence and argued that the ALJ erred when he did not consider the combined effect of both impairments. *Arce*, 185 F.App'x at 439-40. The *Arce* court, however, noted that "borderline intelligence is not merely an *insufficient* non-exertional limitation; it is not a non-exertional limitation *at all*." *Id.* at 439 (emphasis original). Accordingly, the only nonexertional limitation that the *Arce* claimant had was a seizure disorder, so the ALJ did not err when he relied exclusively on the Grids. *Id.,* citing SSR 85-15.

Here, the ALJ found that Plaintiff had *both* environmental and psychological limitations, so *January* and *Arce* are distinguishable. Even if Plaintiff's seizure disorder did not have a significant effect on work that exists at all exertional levels as noted in SSR 85-15, the ALJ was required to consider the combined effect of the environmental and psychological limitations. *See Dellolio v. Heckler*, 705 F.2d 123 (5th Cir. 1983) ("It is well-established that an analysis must be made 'not only [of] the disabling effect of each of the [claimant's] ailments, but also the combined effect of

all of [these] impairments.'"); *Fraga*, 810 F.2d at 1305 ("The well-settled rule in this Circuit is that in making a determination as to disability, the ALJ must analyze both the 'disabling effect of each of the claimant's ailments' and the 'combined effect of all these impairments.'").  The ALJ failed to address the combined effects of all the impairments on Plaintiff's RFC.

In conclusion, because the ALJ found at step two that Plaintiff had severe "cognitive and depression disorder", a nonexertional limitation, and he did not find that the effect of that limitation was not significant, he was precluded from relying on the Grids.  *See Loza v. Apfel*, 219 F.3d 378, 399 (5th Cir. 2000); *see also Hearne v. Barnhart*, 111 F. App'x 256, 257-58 (5th Cir. 2004) (finding error where the ALJ relied solely on the Grids at step five even though he found the claimant's depression to be a severe impairment under step two; explaining that "[i]n *Loza*, [the] Court linked the definition of a 'severe' impairment at Step Two to the determination of whether a claimant's nonexertional impairments significantly affected his [RFC] such that reliance solely upon the Grid Rules at Step Five would be inappropriate").  He was required to make an individualized step five determination with the assistance of VE testimony or other similar evidence.  *Id.*; *see also Wingo v. Bowen*, 852 F.2d 827, 831 (5th Cir. 1988) ("[T]he ALJ's mechanical application of the guidelines failed to consider the aggregate impact of [the claimant's] ailments.").  Because he did not rely on VE testimony or other similar evidence in making his step five determination that Plaintiff could perform other work in the national economy, his decision was not based on substantial evidence. *Wingo*, 852 F.2d at 831 n.4.

### 3.     Harmless Error

The Fifth Circuit has held that "[p]rocedural perfection in administrative proceedings is not required.  This court will not vacate a judgment unless the substantial rights of a party have been

affected. . . . The major policy underlying the harmless error rule is to preserve judgments and to avoid waste of time." *Anderson v. Sullivan*, 887 F.2d 630, 634 (5th Cir. 1989) (quoting *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988)) (per curiam). "[P]rocedural improprieties . . . will therefore constitute a basis for remand *only if* such improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision." *Alexander v. Astrue*, 412 F. App'x 719, 722 (5th Cir. 2011) (emphasis added); *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988). The ALJ's error is harmless if the substantial rights of a party have not been affected. *See Alexander*, 412 F. App'x at 722. The Court must therefore consider whether the ALJ's error in failing to rely on VE testimony or other similar evidence in step five was harmless. *See January*, 400 F. App'x at 931-32 (applying harmless error analysis when the court ruled that the ALJ's reliance on the Grids before determining the claimant's environmental restrictions significantly compromised the claimant's capacity to perform light work was an error).

Here, an SAMC opined that Plaintiff had moderate difficulties in maintaining social functioning and maintaining concentration, persistence, or pace, and that he was moderately limited in nine work-related abilities, including his ability to remember locations and work-like procedures, ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, and ability to complete a normal workday and workweek without interruptions from psychologically based symptoms. (R. at 357, 361-62.) The ALJ found that Plaintiff had environmental and psychological limitations. Because the ALJ failed to consult a VE or utilize other similar evidence to develop the record, there is no evidence that Plaintiff's limitations have been incorporated into the jobs he could perform. The ALJ's decision that Plaintiff could perform other work without consulting a VE or other similar evidence therefore affected Plaintiff's substantial

rights.  The error is not harmless, and remand is warranted.  *See id.*[15]

## III.  CONCLUSION

The Commissioner's decision is **REVERSED**, and the case is **REMANDED** for reconsideration.

**SO ORDERED on this 25th day of March, 2015.**


IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[15]   Because the ALJ's consideration of VE testimony or other similar evidence on remand will affect his determination of Plaintiff's second issue regarding the existence of other work in significant numbers, it is not addressed.